Good morning, Your Honor. Michelle McKenzie with the Federal Defendants of C&J Landau. I'm appearing today on behalf of Mr. Hernandez-Estrada, and I'd like to reserve a few minutes for rebuttal, so I will try and watch the clock. Well, you know, you've got a clock in front of you. You know what happens. Yes. Right. Mr. Hernandez is challenging multiple steps in the jury selection procedures used in the Southern District of California that deviate from the required practices in the 1968 Jury Selection and Service Act and that undermine the Southern District's ability to meet the fair cross-section and equal protection policies of that Act. He's raised four challenges that are exclusively statutory and one that's statutory and based on the 156 amendments as well. So I'm going to start with the statutory challenges first. With regard to the first issue, which is the continued use of an English proficiency standard that predates the 1968 Act, the government has agreed that the language is based on the old version of the statutes. The court made a finding below that it is obviously based on the pre-Jury Selection Act standard as well. So I'm going to start with the question of whether or not the continued use of Question 4 on our juror qualification questionnaire is a substantial violation of the Act. Now, what we know based on a review of the qualification questionnaires and based on the court's finding is that at least 1,420 Hispanic citizens were disqualified from jury service in the 2009 jury wheel because of a no answer to Question 4. That does not include Hispanic citizens who needed assistance filling out the juror qualification questionnaire, and it does not include Hispanic citizens who could have been excused or exempted also answering no to Question 4. These are people who are exclusively disqualified because of their no answer to that question. Counsel, let's assume that if a properly worded Question 4 had been put to all 1,420 of these people, that all of them would have responded yes. Okay? Okay. So all of them should have been in the mix and were excluded. I still don't understand why is that a substantial violation given the relatively small number in relation to the entire jury pool as a whole? It's a substantial violation because it's a distinct, cognizable class that is, at least we've shown through the other data presented in the course of the case, is already underrepresented on the source list that the Southern District is using from which they pull their jurors. Well, but that's where I'm having some trouble. And I understand you're making statutory arguments at the moment and not your constitutional one, but I'm going back to the district court's findings of, well, who was in the pool, in the wheel, and who wasn't. I take it there's no dispute that the eligible population for purposes of this case are citizens over the age of 18, are people over the age of 18? Correct, Your Honor. Okay. So everybody agrees on the denominator, if you will. Yes. The district judge finds that given the percentages of Hispanics and African-Americans in the district, undisputed, that number, I think it's like 22 percent for Hispanics, that depending on whether or not another part of your argument is accepted or not, they're represented within the percentages that our cases say don't deviate from constitutional requirements. So I guess my question is, how does a violation become substantial if at the end of the day, the jury pool that is produced is constitutionally representative of the population? Well, I do think that the jury act issues that have been reviewed by the court in the past have been reviewed under, in two different ways. If it's a jury selection and service act violation that also embodies the constitutional principles, then Mr. Hernandez is obligated to show a disparity that would meet at least the 7.7 threshold set by the jurisdiction. And I'm assuming you can't on this case. You might want to get to that later. Yes. Let's assume that you can't. So what's the standard for substantiality under the act? Well, that is, in fact, the question. That is the question. What's the answer? The answer is if a violation is substantial, it frustrates the policies of the act. And 1861 very clearly states what the policies of the act are. Well, it says what policy of the act is being frustrated here. If in the end we get a representative jury pool, jury wheel, and that's my assumption, you may want to challenge it. If in the end we get a representative jury wheel, what policy of the act is being substantially frustrated by this 1400 or so, some of whom I assume probably weren't qualified. We don't but Judge Watford has given you the benefit. I mean, there are two, right? Randomness and you want people to be excused only on the basis of objective criteria, right? Randomness from a fair cross-section and objective so that people protection can be achieved. And so that's what I'm having a hard time seeing. This certainly seems objective, right? Anyone who checks no, you're out. It's objective based on the laws that existed in 1948. Right. But it's not – there's no subjectivity being involved by the clerk's office people who are reviewing it. It's just if they check no, they're out. Well, it's an incorrect standard of law that's been applied to those individuals. So I think that those, you know, the equal protection component of the jury act that's being frustrated is the denial of, you know, the closing of the courthouse doors to that 1,420 Hispanic citizens. But there's also the fair cross-section component, which is that the qualified jury wheel would have been, would have included 1,420 additional Hispanic citizens. But even if it did, that was Judge Watford's initial question. And there's the jury wheel, the pool for the jury wheel is what, 65,000, right? Something like that. Something like that. The master. Yeah. So if all these people were included, and surely they wouldn't have all been included, but let's assume they all would have been included, would the, how much more representative of the district would this have been? We don't know all these people were Hispanic. We don't know all of them were, which ones were African American. Some of them may have been Romanian. The 1,420 we do know are all Hispanic. From surnames. No. That's from self-reporting. From ethnicity reporting. Correct. And there's a bunch of others that don't make ethnicity reporting. Yes. And the total number of people who are excluded based on their answer to that question is about 3,600. Let me ask the question in a different way. Since we end up with a representative pool at the end of the day, according to the district judge's calculations, are you arguing that you were entitled to a more than representative pool? No. But we don't have, first of all, we disagree that it was a representative pool at the end of the day. But essentially the Court, if we engage in that sort of argument, is asking for a prejudice showing by Mr. Hernandez. And both the Jury Act and this Court's prior case law in Okiyama do not require a prejudice showing. Well, they don't require prejudice showing in the sense that he can show that he would have been acquitted. They surely require that something be wrong. In other words, it's substantiality must require something else other than just a violation of the Act. So how do you get to substantiality? Well, I think, well, in Okiyama there were only, the Court discusses 14 qualification questionnaires. I mean, if it's a question of quantity and numbers, there's only 14 in Okiyama that the Court finds are missing either education, employment, occupation, information. And this Court finds a substantial violation in this case. It's not a quantitative analysis alone. The Court found that where there's, well, in a way I'm turning into a circular argument, but where the violation goes to what the clerk's office is supposed to be doing in the Act. And you have to look at the policies of the Act. But there was subjectivity in that case, right? A clerk looked at a questionnaire and said, I don't think, you know, this is enough education and I don't think that. In this one, the clerk's office just, if you said no, they threw it out. You know, I actually don't think that that's correct in Okiyama. It's missing information. They don't say that a clerk is. They say that clerks have excused some people or have excused some people, but in terms of the people who were included in the pool, where there is missing information, there was no objective determination by the clerk to include those people. It was just that information is missing on their qualification questionnaires. Well, counsel, I guess what I'm still having trouble with this, because I could understand if this falsely worded question four was resulting in, you know, mass underrepresentation of Hispanics within the pool of jurors who actually got chosen. You know, some significant disparity, 10, 20 percent, whatever it would be to get above our case's threshold. But if we're below that, right, I mean, this 1,420 people would not have gotten, you know, wouldn't have put places above that. I don't understand how the Acts Fair cross-section policy is being at all thwarted. And so unless you can point me to why the randomness or objectivity policies are being thwarted, then I guess I just don't see how you're going to succeed on this challenge. I don't think this Court's prior case law requires us to show a meeting a constitutional disparity, you know, like is required in a Duran challenge or Custody of the Challenge. It has to do with, you know, just like in Oak Hill, it has to do with frustrating the policies of the Act. Those people would have been included. So as to the equal protection argument, I guess the Court sees that. But we don't know what the final, you know, for a number of other arguments that Mr. Hernandez raises in his brief, we don't know what the final representation is of Latinos on his jury wheel or on the preceding jury wheel. That's unknown. It's only his that's relevant, isn't it? I'm sorry? It's only his that's relevant. As to the jury selection. His jury wheel. As to the jury selection, yes. Okay. So let's go back to that because I thought the record was pretty clear on that. No, the Court has to go through machinations to get that. Well, there's only two ways to do it, and the Court does it. I mean, it accepts one of them, but the other way doesn't help you. You can assume that all the people who don't put ethnicity on their questionnaire, if they're all Hispanic, then, boy, we have enormous overrepresentation of Hispanics in the jury wheel. If they're all not Hispanic or African American, I know the Court said we'll just ignore them. But if you assume that they're all Anglo, you still can't get to a number that To a constitutional violation, no. To the jury act violation is a separate and distinct question. Yeah, and that's a separate, those people are a separate issue than the one you're now raising. Those are people who just didn't put, who answered question for yes, I understand all this stuff, but didn't put that ethnicity. Correct. But if you put all those people back into the pool and assume the worst, which is that they were all white people, you still can't get to a constitutional violation, can you? To a constitutional violation, no. But I don't think that that's required to prevail on a jury act claim. And what case law do you have that separates those two? Because I thought the standard was basically the same with respect to the, if you're relying on a violation of the Act's fair cross-section policy, I thought our cases said the standard is the same. That, well, no. I mean, I think if it's a constitutional challenge, that's what, you know, what Andrea Gislara discusses and what Sanchez Lopez discusses. But as to the statute, as to a violation of the statute, OKIAMA doesn't engage in any constitutional analysis whatsoever. It merely looks at whether or not the policies of the Act are frustrated. And so which policy of the Act is being frustrated here? Both the fair cross-section and the equalization. Okay. And so your position is that you can have a frustration of the fair cross-section policy of the Act, even though the end of the process produces a constitutionally acceptable wheel? Yes. And I think that's what happened in OKIAMA. There were 14 people who made it on to those, who made it on to the grand jury wheels or the pedigree wheels. And that kind of work. How big was the wheel in that case? Do you recall? It was, they sent out 600 questions in the District of Guam. They sent out 600 questionnaires, and it was 400 maybe returned, I want to say were the numbers. This was a fairly substantial number of the questionnaires that actually came back. Yes. But I think that this Court can also look at the percentage of Hispanics, of Hispanic citizens who are disqualified because of this question. It's 25 percent of all Hispanics who are removed are removed because of this question. It's a distinct class within the Southern District that is affected by this erroneous language. I guess I'm repeating myself here. It seems intuitively wrong, but the record seems to show it. That if you've got this practice which disqualifies a lot of Hispanics improperly, in your view, we still end up with a constitutional wheel. Does that mean that perhaps most of these people would have been disqualified in the process anyway? They were just disqualified inappropriately early? I don't think it's fair to say that most of these people, based on the questionnaires that we provided. Well, you have a dozen sort of ones that you've analyzed. They're not statistically significant. We really don't know how many of these 1,400 people would have been properly excluded at the end of the day anyway. Well, we know that they shouldn't have been. We know that these 1,400 people should not have been disqualified. By the clerk. By the clerk under 1865B2, because they all filled out the questionnaire satisfactorily. So they definitely satisfied that aspect of the jury qualification statutes. The only real question that remains is whether or not a yes or no answer to that compound question means that the person can't satisfy 1865B3, which is being unable to speak the English language. And we argue based on more than a dozen questionnaires, well over a dozen questionnaires that were submitted, that based on education as registered nurses, as teachers, as dental assistants, as bank tellers, that these people speak the English language. And the court found that the answer, a no answer to question 4, was clearly wrong on their part. And then went on to speculate, well, maybe people are trying to avoid jury service, although there's nothing on that part of the questionnaire that indicates a no answer would remove somebody as a candidate for jury service. There's nothing on that part of the questionnaire. Well, on the bottom of the questionnaire, the person signs the form under penalty of perjury. The court then speculates that when people say they don't know legal terms, that really they're meaning they can't be a juror. But nowhere on the form is the correct current standard for English proficiency stated. You're speaking in terms of a statutory violation, right? And where in the statute does it say that everybody who qualifies has to be included in the jury pool? Now, put aside the question of ethnicity. It's not an insignificant question. In fact, it's the key question, I think, here. But let's put it aside. Let's say the district says, look, we have this pool we draw from, and we just get vastly more people than we need. So we tell the clerk that every other response will be thrown out, or every tenth response, every fifth response. Just randomly throw them out because, you know, we just don't need that many people. That's not a violation of the Act. The Act does not preclude a mechanical process by which only some people who qualify get included in the wheel, right? If that person's already been determined to be qualified and then get removed and then they're removed? Well, let's say there's no qualification. The questionnaire comes back, and they say, look, well, again, so put aside any discretion or any possibility of, you know, racial or ethnic or selection or anything else. But as I said, we're just getting too many of these questionnaires. So we will tell the clerk, throw out all the evens or throw out all the odds. And before look at any of the answers or anything else, just throw those out and look at them. The question is, you know, is there something in the Act that guarantees that everybody that returns a questionnaire who is eligible will be included in the jury wheel? You know, I don't know. There are some really technical parts of the Act. I would have to go back and look. But let's assume that would violate the Act. I mean, I think that's the assumption. The Act doesn't allow you to do it that way.  I think it would be unlikely, because for two reasons. One is there's no showing that the defendant in that circumstance could make any showing about the distinctive nature or protected characteristics of the class that are excluded. It appears to be completely random in nature. Whereas we know that it's a cognizable distinct group that is being disparately affected by this erroneous Question 4. So if it was totally random, I mean, it could be a technical violation. Is there? But that's the question. It wouldn't be a violation at all. There's nothing in there. The Act sets criteria, right? But it doesn't say everybody who meets the criteria has to be included in the wheel. It says these people can't be if you don't speak enough English, if you're not. I forget what all the criteria are. So it says you exclude anybody who doesn't meet these criteria. It doesn't say you include everybody who does meet the criteria. It says you must qualify them. It says they shall be qualified. The next question the Court is asking is whether or not that qualified person then needs to be put in the wheel. I don't know that it speaks to that. But when Congress changed the Act or created the Jury Selection Service Act in 1968, they changed the preamble language to the qualification process to say no longer is a person discompetent to serve, but the chief judge, the district court judge, the jury clerk who is making that determination shall deem this person qualified, shall deem them qualified unless they meet this disqualifying criteria. So very little discretion is left, or no discretion essentially is left. But that gets us back to the question of how you select your people to send a questionnaire from the population as a whole. And that sort of backs into your constitutional argument. They don't send these questionnaires to everybody. They use, what, jury rules in the Southern District, right? In the Southern District, voter registration rules, yes. I'm sorry. That's what I meant. Voter registration rules, right? They could use DMV records. They could. They could use, I mean, there are other databases they could use. And Eastern District, I think, includes DMV records, right? That's correct. Eastern District, both districts in Washington. You're not claiming there's a statutory violation. I know you're making a constitutional argument for failure to use the DMV rules, but you're not making a statutory argument saying you've got to send questionnaires to a wider audience, right? As to the number of people that are being sent the qualification questionnaires, no. We are making a statutory argument that the court needs to be supplementing based on the plain language as well as history of the Jury Act. But that's separate and apart from just the volume or number of people who are being sent questionnaires. That statutory argument, again, help me on it. Is that an argument they need to be supplementing because the ultimate wheel is not constitutional? Or is it why do they need to be supplementing, in your view? Well, in the Jury Act, in 1863b, they say that the plan shall designate additional sources when necessary to protect the policies and further the rights secured by the Jury Act. And this may be a circular question, but if at the end you produce, and I know you don't agree, but if at the end you produce a wheel that is constitutionally representative, is it then necessary to supplement? You know, under this Court's case law, if it's the identical test between a Sixth Amendment and a balance, then no. That's what I thought, yes. I mean, I think that there is, there's definitely a lot of language in the House report. They cite four different times that the way that they achieve the fair cross-sectional goal is by using voter lists and supplementing when necessary, whenever local voting practices do not render the list representative. And here we've shown that Hispanic citizens under-registered to vote 15 percentage points less than non-Hispanic citizen whites, and African Americans under-registered to vote about 8 percentage points on average than non-Hispanic whites for the decade preceding this, this challenge. But based on the Court's interpretation, the constitutional requirement is correct. I think in this jury plan it's still in effect. That is correct, Your Honor. The Court And your office hasn't challenged the plan other than in this litigation. There's been no request of the district court to modify its plan. For the 2011 wheel, no. This challenge by Mr. I understand. This does not affect, and we could stop the clock, but you'll never get negative numbers anyway, so it doesn't matter. The plan gets implemented every year, but the plan stays in effect once it's approved by the Judicial Council until it is amended, and then it has to be re-approved by the Judicial Council. So I'm just asking in terms of the future, which may or may not affect your client. In this case, has there been any attempt to get the district court to modify the plan or to petition the Judicial Council to decertify the plan? I'm reasonably sure the second isn't true because I'm on the Judicial Council and I haven't seen one. There has been no attempt to persuade the Judicial Council to intervene. However, Mr. Hernandez I'm not sure you could. I don't mean to suggest you could, but perhaps. I don't know. But there's been no effort to get the district judges to modify the plan. Other than the context of this litigation and the court's repeated orders, both in Garcia-Arellano in 2009, which recommended all of these changes, recommended supplementing the list, changing the language, retrieving questionnaires that were missing ethnicity and race information, and filling out the reports on time. And then two years later had to make the same recommendations that he made over four and a half pages in 2009. No, there's been three years of the same knowledge of these problems, continuation of the problems in the same class being affected. So writing a letter to the chief judge and suggesting, I mean, I don't mean you personally. Obviously, this would be something for your office to consider, a letter to the chief judge petitioning for change in the jury plan. Judge Moskowitz, formerly District Court Judge Moskowitz, is now Chief Judge Moskowitz. So perhaps he will implement his own recommendations. But the fact that it hasn't happened over the last six years in three wheels doesn't Doesn't bode well. Doesn't bode well. Despite his repeated findings of violations, there has been no change. Sometimes litigation is not the best way to get these things done. Okay. Thank you, Your Honor. We'll hear from the government. Good morning. Thank you. Victor White for the United States. I wanted to start with the question that most of you were asking. How is it that if we have a constitutionally sound jury pool, we somehow get to a substantial violation? Because even if we were to assume that that 1,420 Hispanic prospective jurors were somehow qualified, as far as meeting the statutory requirements of the English language, that wouldn't give anything under the law as far as what's required. This Court has consistently found absolutely. Well, let's say the jury plan provided that every tenth questionnaire where the answer has a hyphenated last name gets thrown out. Well, let's say that. Would that be okay? Because in the end you wind up with a wheel that's constitutionally balanced. I think in that case you'd need to look more closely at it. Obviously the concern with the Jury Service and Selection Act is for both randomness, that fair cross-section, and objective criteria. I think hyphenated last names is going too close to those concerns that Congress had. Well, but so is speaking English. I mean, the two things are not that different. If you sort of lined up hyphenated last name and ability to be thrown in English, you'd get pretty close. I would gather you would get quite a correlation. I think, again, this is where Congress spoke clearly that a statutory requirement is the ability to speak English. And that's something that's, again, in the statute. It's an objective criteria that's imposed. You haven't answered my question. It's hyphenated last name. Yeah. Let's say that was the criteria. They said, you know, the clerk has discretion to throw out everyone or every tenth one, with a hyphenated last name. I mean, we all know hyphenated last name usually is a Hispanic name. I mean, we've seen lots of them, you know. Maybe even this. Four. Yeah, there we go. Yeah, I knew the semantics. I didn't remember that. So, you know, that's very common. You know, it's a seemingly objective criteria, but we know that in context it is a proxy for being Hispanic. And for better or for worse, you know, if you live in a district close to the border in particular, or at least a border with a country that has a different language than ours, not so much in Canada, I suppose, in the West, but proficiency to speak English is sort of a proxy for being Hispanic. I mean, there's no two ways about it. And doesn't that in and of itself become a significant issue? And even if in the end you wind up with a constitutionally balanced jury pool, you would say the process of excluding people that have this criteria that is a proxy for ethnicity becomes in and of itself impermissible. It does when you have a process where you're using something as a proxy for ethnicity, such as a hyphenated last name. Something that, again, the jury services... But what is more of a proxy for ethnicity than the inability to speak English? I mean, if you're in San Diego and you're unable to speak English, I mean, there's some chance you're Vietnamese, but not that high. And then the next thing, so the big pool out there of people who are not fluent in English are people whose primary language is Spanish. There's no doubt about that, is there? There's no doubt that, you know, there are a large number of Hispanics in two counties that border the United States-Mexico border. However, what we saw in going through the juror questionnaires is over 30 percent of those answering no to question four were not Hispanics. And that answer... Well, what that tells me is that 70 percent of those who answered no were Hispanic, and Hispanics are certainly not 70 percent of the population of San Diego. So that means there's a vast over-representation of principally Spanish-speaking speakers in those who got thrown out by use of this question, right? Yes, but the criteria, the English language requirement, and the way it was applied was applied objectively, because other ethnicities were also thrown out if they indicated no to question four. But that doesn't help you in the least, because if you have a criterion that applies disproportionately to one group, then the fact that it is applied objectively and also in a less proportionate or in a disproportionately smaller way applies to other groups doesn't make any difference, because it then becomes a filter immediately that discriminates against this particular group. But the filter isn't so much whether or not we're not going to the fair education and to other sorts of criteria that Congress has been concerned about. We're talking about a statutory criteria. Yeah, but you can see that the question under which people were disqualified was overly broad. Yes, with regard to reading, writing, and understanding, not with regard to speaking. And of the group that was disqualified because of this overly broad question, it was disproportionately Hispanic. Yes. Okay. And when you say, yes, disproportionately Hispanic, you mean disproportionate to the population as a whole, not just disproportionate to the group of people answering the question, but far more Hispanics got knocked out with this question than you would expect if there were a random distribution, if it were just a flip of the coin or a random draw, right? Yes, because we saw that basically of those answering no to question four. Why doesn't this immediately become an ethnic filter and all this other talk becomes sort of irrelevant? And why isn't the question before us is should we, does the statute permit districts to adopt a racial ethnic filter in their selection of the jury rule? Because I think the cases out of the First Circuit, which are looking at the District of Puerto Rico. Yes, but that's a different circuit. Why don't you tell us what we should do in the Ninth Circuit? Well, in the Ninth Circuit, we should continue to apply the concern that this Court had back in 1975 with a statutory violation for inability to speak English in Okeyama looking at Guam. And in that case, the Court, this Court overturned the district court who had found that there was substantial compliance with the Jury Service and Selection Act. And the reason that this Court overturned the district court is because they were looking at eight out of 23 persons selected as grand jurors failed to answer the question about their education. One person indicated they could understand very little English. And so in reviewing this, the concern was again, and here's from 521 Fed 2nd at 604, the deficiencies in the selection process created the serious risk that those selected were not sufficiently proficient in English to understand the proceedings in which they were to participate and further that the veneer did not represent a fair cross-section of the community. This is the critical concern. It's not a discriminatory intent. It's a statutory requirement of being able to read, write, and understand English sufficiently well. I'm still having difficulty here. So just we all agree that the statute can approach. The statute could still read the way it read before the amendment. It probably would be constitutional. But you've got a question here which is under the statute improperly over-inclusive if used as a disqualifier. Do you agree? That the language of this? Yeah. The language says can you speak English, can you read it, are you fluent in legal terms, right? There could be situations where people would read it overly broad. But there's nothing on the questionnaire itself that has anything to do with your understanding of legal terms. Doesn't it say fluency? It just says do you read, write, or speak English. It's that excerpt of records. Yeah. What's the exact question? The exact question is do you read, write, speak, and understand the English language, yes or no? And if you answer that with no, you're disqualified. That's correct. And so that's why, at least with regard to the question about fluency in legal terms. And the way that the statute requires is under 1865b2, is unable to read, write, and understand the English language with the degree of proficiency sufficient to fill out satisfactorily the juror qualification form. And then the second provision under b3 is, is unable to speak the English language. So as I indicated, there is no modifier as to whether or not you speak English language that's not contained in the current version of question 4 on the questionnaire. It's only with regard to reading, writing, and understanding the English language. And I know that Appellant Counsel contends that being able to just merely complete this questionnaire somehow is sufficient evidence that they are proficient, but. Well, put that aside. Let's go back to the basic question, because I thought the government had conceded that the question was outdated. Yes. The question, people who answered no to that question could well be qualified – could be qualified conceivably under the current version of the Act. There's no record. There's no evidence. I understand. But it could be. Put aside the record. Put aside the record. They have 12 examples. Whether or not they're good examples or not doesn't matter. So you've asked a question which disqualifies – which on its face may disqualify some people, and it is disqualifying in the Southern District. The Court throws you out because of it, that are qualified. And that's where we have to go back to Your Honor's question as to is it a substantial – what's the substantiality of the violation. And here we go back to what's the purpose of the Jury Service and Selection Act. For a fair cross-section of the community, competent jurors, no subjective criteria being used to select these individuals. But also randomness. And why doesn't this improperly phrased question interfere with the randomness policy? Because, as the Chief Judge pointed out, 70 percent of the people being disqualified are Hispanic, whereas they only make up 22 percent of the population. And under this – this Court's randomness requirements, which is up to a 7.7 percent absolute disparity, in this case, the appellant was basically indicted by a – That's not – that's for the fair cross-section policy, not for the randomness policy. The 7.7 percent you're talking about is for the fair cross-section. We're conceding for purposes of this discussion that the fair cross-section policy is not being interfered with. But one of the other policies is randomness, that there needs to be – there needs to be a random process of figuring out who amongst the larger community is going to wind up on the wheel, and why doesn't the 70 percent versus 22 percent of the population interfere with that policy? This Court has also examined that randomness and said that it's not in the statistical or mathematical sense of randomness. It's randomness with regard to a fair cross-section. And so while that 70 percent who are answering no, these are people who are self-reporting that they're not qualified. And so this is a group that if – Well, they're self-reporting that they may be among the group that is not qualified. In other words, if the question is overly – is overly broad, they're self-reporting that there may be a problem. They're not self-reporting that they're not qualified. Correct. And this group that's self-reporting that there may be a problem is slightly over 10 percent of the total number of Hispanics, prospective jurors who returned to these questionnaires. But what I'm stuck on is that if it were truly random, if we had a violation and it were some truly random criteria that were being imposed, we'd expect the number of people to be knocked out would be roughly the same as the percentage of the population, right? And clearly that's not the case here. So how is this not a problem from a randomness standpoint? If I understand Your Honor's question, it's basically if there are 70 percent that are being knocked out, why isn't that somehow being reflected in the total number of the jury pool or? No, it just seems that there is a problem from a randomness standpoint here. That's one of the policies that the Act is trying to protect. If a particular criteria is knocking out such a disproportionate number of prospective jurors relative to their population within the larger community. The issue, though, again, going back to randomness, is as this Court's indicated, it's not in the mathematical or statistical sense because, again, the purpose is to avoid discrimination on the base of race, national origin. No, Your Honor, you're conflating the randomness and the fair cross-section requirements. There are separate requirements. You could wind up with a fair cross-section, and yet if you had a criterion that operated specifically against a particular ethnic group, I mean disproportionately against a particular ethnic group, that would be itself invalid, even though what you wind up with in the end was still within the range of acceptable in terms of fair cross-section. But then I think this goes back to Your Honor's question about if you had even numbers that were all excluded as the example of something random. The even numbers, if you took all those things that were excluded, you would look at all the, let's say, Hispanic names, and you would expect that the number of Hispanic names in the group excluded would reflect the population as a whole. I don't mean the population of the district. The population of the people answering the questionnaire as a whole. Why? Because you apply the purely mechanical random criteria to exclude certain ones. And so the excluded population would look just like the entire population. But let's hear the question about, I mean, this is now sort of out of date, but about sickle cell anemia, right? Remember the 60s? You weren't around in the 60s. I wasn't. But, you know, that was a, I think it's no longer prevalent, but it used to be something that was transmitted only among African descendants, descendants of African descent. And let's hear the question like that. You say, well, if you have this particular health problem, we're going to exclude you. Well, the effect would have been that 100% of the people excluded would have been black. So even though it's an objective criterion, it would have been an objective criterion that makes an ethnic distinction. Why isn't this just like that? Because, again, this is one where we're not looking at the sort of concerns that Congress had in enacting the Jury Service and Selection Act of those fair education, good judgment that would be these kind of proxies that are pernicious forms of discrimination. Well, you see, I take it your answer here is that people who don't speak English are disqualified. And so the real question is of the group of people who don't speak English in the district, is 70% Hispanic an unfair outcome? Whose burden is it to show that? And the burden on the substantiality is on the litigant, and that's something that's So it strikes me as intuitively correct that if, when we're looking at the Southern District of California, at the population of people who don't speak English, they would be overwhelmingly Hispanic. You've identified a broader group here. You've identified people who also say, I don't read and write. But I'm trying to figure out whose burden it is to show that that leads to a disproportionate exclusion of non-English speakers. And this Court in the Nelson case found that it's the litigant's burden. And, again, the litigant is the moving party under 1867A has the burden of making the showing here, because, again, we're dealing with objective criteria, a statutory requirement of English language proficiency. The fact that the two counties border the U.S.-Mexico border is explaining, in large part, why it's 70%. I indicated in the opening briefs that while we don't have a great handle on English language proficiency of jury-eligible Hispanics in that district, of those ages 5 and up who are U.S. citizens, in both districts, both counties, there's nearly 20% that don't speak English very well. So if we look at, again, the demographics in the Southern District of California and look at the fact that this is, again, an English language requirement, a subjective criteria, something that Congress wrote into the statute, there is no substantial violation here. Well, getting it – so stepping aside from the particular question in this case, which I'm sure is of immediate interest to you, but if we've not had a determination by Judge Moskowitz that there are deficiencies in the jury plan, and it's a little troubling to have the district continue applying a criterion that's been found to be overbroad, that the government itself has admitted is overbroad. And, you know, I'm – you know, if – so the dilemma here, if one sort of approves this, if we approve this, then it'll continue because there seems to be no move to correct the problem. Or maybe it's not even recognized as a problem. Your Honor, it is recognized as a problem, the outdated language in there. And I would just note that, again, in the definitions of the Jury Service and Selection Act, it's using the same outdated language as to the qualification of English language without the qualifier for it being sufficiently proficient to satisfactorily fill out the form. But Judge Moskowitz, in a previous case that didn't rise to the level of appeal, did send a letter to basically the chief judge at the time. The chief judge at the time did send a letter, I believe, to the committee, the judiciary or to look at changing the language on this. Because it's our understanding that the questionnaire and the language on this questionnaire is not solely used by the Southern District of California. It's a form that's used. But the plans are adopted district by district. And, in fact, we know that the Eastern District has amended its jury plan in various ways, including expanding the jury pool. So whereas modern language sometimes is often drafted by our jury, I forget what the committee is called. We have a circuit-wide committee that deals with these questions. Whether it's actually adopted or implemented is done on a district-by-district basis. It's a little troubling to have a district discover it's got a problem and continue year after year using the problematic questionnaire. And my understanding, Your Honor, these juror questionnaires are Scantron fillable forms, ones that basically are used by an electronic software company. And so the question, again, from this questionnaire is one that's a standardized form from the administrative office of the courts. But my understanding is, again, it has been raised. Saying what? Your Honor, that, again, this question, it has been raised that it should be amended and it should be changed. Nothing says that once the question is filled out, the answer must be a basis for automatic exclusion by the clerk's office. The district could say, whoops, we have a question there that's too broad. Instead of having the clerk's office exclude everybody that answers yes to this question, we're going to refer it to a magistrate judge or district judge or we're going to have some criteria from narrowing down those people who answer the question in the affirmative to see whether or not, you know, only exclude the ones. So this flags a problem. It doesn't necessarily require exclusion of everybody that answers yes to the question, does it? Your Honor, I think, again, the way that the question is worded is outdated. It is being addressed. There is efforts being made to have that corrected. As far as another process, another level of review of that, I think, again, if the Congress basically said, in looking at the statute and in looking at statutory qualifications, the primary evidence is the juror qualification form. And so to then add an additional layer of potentially introducing review of, well, at what level do we have basically a degree of fluency that's sufficient or not could result in even more problems than are being raised. Okay. Thank you. Thank you. I think you were out of time. I don't know whether you want to take a minute for a bottle or not. Just two points, Your Honor. With regards to whether or not a no answer to that question would result in automatic disqualification, there is actually a section in the Jury Act, 1864A, that contemplates filling out a questionnaire a second time in the presence of the jury clerk when a person comes in for jury service to kind of confirm the answers if there is any sort of question. And I think that, if I remember correctly, the House report discusses this as a means to verify with regards to the language requirements that a person is, in fact, qualified. So there is a means in the Act available to have kind of a secondary check. And then ---- So I'm sorry. What you would contemplate is that people who answer yes to this question be called in just like everybody else, and then they be examined or ---- People who answer no. Questionnaire or they be sent to a courtroom for a judge to examine them or something like that? I think under the Act it expressly says that the jury clerk or jury administrator cannot make that final qualification decision. They must make notes and send it on to the court. But I think that would be far superior to what we presently have where the courthouse doors are just completely closed from the outset. At least there would be a record made and there would be a district court judge that's making the determination of qualification based on the legal standard as it exists today. And then I should have cited the court to additional cases in addition to Okiyama based on the JSSA, whether or not you need the constitutional statistical underrepresentation to prevail an exclusively statutory claim. I should have also cited there's three cases out of this circuit that deal with the statutory claims exclusively. Are you familiar? I know there's a case or cases in Central District raising some of the same issues. Are you familiar with that case? I'm familiar with counsel in that case. I've spoken to Mr. Wilkie. I'm not going to ask you about the details. I was just going to ask if you knew where and what stage of proceedings that case is at. They've just filed motions. And my understanding is that they're exclusively constitutionally based, not based on the language of the questionnaire or the jury act. Just constitutional. Correct. Constitutional underrepresentation. That's the one in Orange County, right? There's one in Orange County. And I think there's actually one that's been just filed in L.A. a week or two ago. The three cases I should have also included is United States v. Erickson, United States v. Goodloe, United States v. Nelson. And there are two Nelsons. The Nelson I'm referring to is at 718 F. Second. These are cases? 315 that deal with the one of the original questions was whether or not in order to prevail under a jury act, statutory claims, we have to meet. These are not in your brief? They are all in the brief. I should have just brought them to the attention of the court. In addition to Okiyama, those three cases are all in the briefs as well. Okay. The Nelson case, you said 718 F. Second. 315. Thank you, Your Honor. Okay. Thank you. The case is aye. We'll stand subpoenaed. We'll adjourn. All rise.
judges: Kozinski, Watford, Hurwitz